UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   10/20/2014

-------------------------------------------------------------------X
                :

CHRISTOPHER HOWARD,              :

               Plaintiff,    :

                :      12-CV-8614 (VEC)

      -against-        :

                :    OPINION & ORDER

THE CITY OF NEW YORK, THE NEW YORK  :
CITY POLICE DEPARTMENT, and DR.    :
CATHERINE LAMSTEIN,         :

           Defendants.  :

                :

-------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      Plaintiff Christopher Howard brings this action, alleging wrongful termination from the

New York City Police Department ("NYPD") on the basis of his disability or perceived

disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 1201 *et seq.*

("ADA"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.*

("NYCHRL").  Defendants moved for summary judgment on the grounds that Howard could not

fulfill the essential functions of work as a police officer or, in the alternative, that it was

reasonable for them to think so when they terminated him.  Because Plaintiff has not adduced

evidence sufficient to create a genuine issue of material fact, Defendants' motion is GRANTED

and the case is DISMISSED.

## BACKGROUND

      This is a sad case.  Christopher Howard "wanted to be a cop for a long time."  Umansky

Decl. Ex. A at 103.  In 2010, his dream was temporarily realized when he was appointed a

Probationary Police Officer ("PPO") and graduated near the top of his class from the Police

Academy.  Compl. ¶ 21.  But after graduation, his dream began to slowly unravel.

Within the first month on the job, Howard experienced significant physical symptoms (nausea and diarrhea) associated with anxiety.[1]  Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Defs. 56.1 Stmt.") ¶ 26; Umansky Decl. Ex. A at 18-19.  Those symptoms culminated in what appears to have been a full-fledged panic attack on February 22.  Defs. 56.1 Stmt. ¶ 29.  While on duty that day, Howard was eating a familiar meal at a restaurant where he had eaten before, when he suddenly became very sick – he felt nauseated and hot, his face flushed and reddened, he started sweating, his heart was racing, and he felt enormous pressure on his chest.[2]  *Id.*  Howard called in sick the next two days and visited Dr. Hernandez again on February 24, 2011; the notes from that visit reflected Howard's complaints regarding stomach symptoms.  *Id.* ¶¶ 30-32, Umansky Decl. Ex. D at PSYC 25.  During that visit, Dr. Hernandez prescribed Zoloft, an antidepressant that is also used to treat anxiety.  Defs. 56.1 Stmt. ¶¶ 33-34.

On February 25, 2011, still not feeling well, Howard called in sick for the third straight day.  *Id.* ¶ 35.  As required by NYPD procedures, Howard reported to the District Surgeon, Dr. Hornyak, who, with Howard's consent, placed him on sick leave for one week.  *Id.* ¶¶ 35-36.  During that week, Howard suffered hot flashes, nervousness, irritability and rapid heartbeat.  *Id.* ¶ 37.  On March 3, 2011, Howard began to see licensed clinical social worker ("LCSW") Steven Spirn, a psychotherapist and hypnotherapist; he saw Spirn approximately once or twice a week

---

[1]     His symptoms were sufficiently severe that he visited his primary care physician, Dr. Lisa Hernandez. Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Defs. 56.1 Stmt.") ¶ 26.  Dr. Hernandez prescribed Librax, which is a combination of benzodiazepine and anticholinergic medication that is used to treat "nervous stomach" and anxiety.  *Id.* ¶¶ 26-27.  Dr. Hernandez's notes from February 19 indicate that Howard reported having nausea and diarrhea for three weeks (*i.e.,* dating back to late January 2011, just under one month after he began work as a police officer).  Umansky Decl. Ex. D at PSYC 25.  Her notes also reflect that Howard reported a number of "stressors," including the beginning of his job with the NYPD and the end of a volatile nine-year romantic relationship.  *Id.*; Defs. 56.1 Stmt. ¶ 28.

[2]     Any suggestion that his symptoms were from a stomach virus is undercut by Howard's acknowledgement that the symptoms subsided when he exited the restaurant and resumed when he re-entered the restaurant.  Defs. 56.1 Stmt. ¶ 29; Umansky Decl. Ex. A at 95.

for a total of five to seven visits.  *Id.* ¶¶ 38-39.  According to Howard, Spirn suggested that he

speak to his doctor about the side effects of Howard's medications.  Umansky Decl. Ex. A at 35.

On March 4, 2011, Dr. Hornyak, unaware that Howard was taking Zoloft, cleared him to

return to work.  Defs. 56.1 Stmt. ¶¶ 41-42.  Howard had regular days off scheduled for the next

two days; on March 5, 2011, he checked in with Dr. Hernandez, who prescribed Xanax, an anti-

anxiety benzodiazepine.  *Id.* ¶¶ 43-44.  Dr. Hernandez's notes from that visit reflect in part that

Howard reported suffering from "[a]nxiety & panic diarrhea."  *Id.* ¶ 45.  On March 6, 2011,

Howard "felt hopeless and helpless and just wanted to lie in bed;" he stopped taking Zoloft,

which he believed was making his symptoms worse.  Umansky Decl. Ex. C ¶ 5.  The next day –

which would have been his first day back at work after approximately two weeks on sick leave –

he called the NYPD sick desk and reported heightened anxiety.  Umansky Decl. Ex. A at 28.

The NYPD sick desk referred Howard to the NYPD's Psychological Evaluation Section

("PES").  Defs. 56.1 Stmt. ¶ 49.

On March 7, 2011, Dr. Catherine Lamstein, a psychotherapist with the PES, met Howard.

*Id.* ¶¶ 9-13, 51.  Although Dr. Lamstein and Howard have different recollections of what Howard

said during their initial meeting, the differences are not material.  Both agree that Howard related

that he experienced stomach virus-like symptoms during a stressful time at the Police Academy

and that he had recently experienced a full-blown panic attack and periods of anxiety.  Umansky

Decl. Ex. A at 31-32, Ex. B at 105-07, 96.

Dr. Lamstein and Howard discussed the stressors in Howard's life, including a romantic

breakup.  Umansky Decl. Ex. B at 96-97, 134.  They discussed Howard's work as a police

officer; Howard told Dr. Lamstein that he did not like car stops because they were "too

dangerous."  *Id.* at 103.  Dr. Lamstein also spoke with Howard about his family.  He reported

that one of his parents has an anxiety disorder, one sibling suffers from anxiety following a

traumatic event, and one is a recovering addict. *Id.* at 86-88.

Dr. Lamstein spoke with Dr. Hernandez and LCSW Spirn. Defs. 56.1 Stmt. ¶¶ 55, 57.

Spirn shared with Dr. Lamstein his tentative diagnosis of Adjustment Disorder and his

observation that Howard was "desperately" concerned about losing his job because of his

medical issues. *Id.* ¶¶ 59-60.

Meanwhile, at Dr. Hernandez's suggestion, Howard began to see Dr. Anna Kharitonova,

a psychiatrist. *Id.* ¶ 62, Umansky Decl. Ex. A at 37. Dr. Kharitonova's notes from March 8,

2011, reflect that Howard's "chief complaint" was "panic attack, anxiety, [illegible] depressed

mood, low energy." Umansky Decl. Ex. F at PSYC 82. Under "history of present illness," Dr.

Kharitonova mentioned stressors in Howard's life such as his new job and his breakup and also

discussed physical issues, including "stomach virus for 3 weeks." *Id.*[3] Dr. Kharitonova

diagnosed Howard with Adjustment Disorder with Mixed Anxiety and Depressed Mood[4] and

Panic Disorder without Agoraphobia. Defs. 56.1 Stmt. ¶ 66. Dr. Kharitonova changed

Howard's medications to Lexapro and Klonopin, medications used to treat anxiety. *Id.* ¶ 70.

On March 16, 2011, Howard, who was still on sick leave, returned to Dr. Kharitonova.

The psychiatrist's notes from that visit reflect that Howard "report[ed] no panic attacks" in the

eight intervening days "but still experience[d] a lot of anxiety, fe[lt] pressure" and suffered from

"anxiety attacks." Umansky Decl. Ex. F at PSYC 54.

---

[3]     Howard saw Dr. Kharitonova approximately three weeks after he first saw Dr. Hernandez. Defs. 56.1
Stmt. ¶¶ 26, 62. At the time of his first Hernandez visit, Howard also reported three weeks of stomach virus-like
symptoms. Umansky Decl. Ex. D at PSYC 25.

[4]     Adjustment Disorder with Mixed Anxiety and Depressed Mood is typically a temporary condition that
dissipates within approximately six months. Umansky Decl. Ex. B at 309-10. A patient's symptoms include
difficulty in adjusting and gross overreactions to changes in the patient's life. *Id.*

The next day, Howard met again with Dr. Lamstein.  Defs. 56.1 Stmt. ¶ 72.  Howard

reported that he had undergone a colonoscopy on March 15 that revealed Irritable Bowel

Syndrome ("IBS") and also told Dr. Lamstein that his nausea and diarrhea were improving.

Umansky Decl. Ex. B at 163.  Howard reported only "mild" anxiety symptoms since switching

medications; he told Dr. Lamstein that he had changed his dosing schedule to reduce the amount

of time each day in which he was experiencing anxiety.  *Id.* at 164.  Howard had spoken to his

father the day before about returning to work and reported that this conversation caused the

"worst anxiety he had [experienced] in a week" but insisted that he was looking forward to

returning to work.  *Id.* at 165, Defs. 56.1 Stmt. ¶ 74.  Dr. Lamstein permitted Howard to stay out

sick another week and scheduled him to report back to work on March 24, 2011.  Defs. 56.1

Stmt. ¶ 76.

On March 23, 2011, Howard saw Dr. Kharitonova, who noted that he reported being less

anxious but continuing to experience some anxiety attacks.  Umansky Decl. Ex. F at PSYC 53.

The next day he saw Dr. Lamstein again; he reported to her that his anxiety had improved to

"only a little bit" and that he had diarrhea "approximately every other day," and "almost no

depression."  Umansky Decl. Ex. B at 166.  Howard told Dr. Lamstein that he felt well enough to

return to work on modified duty but that Dr. Kharitonova was not comfortable with his working

while on Klonopin.  *Id.* at 167-68.  Dr. Lamstein delayed Howard's return to duty in order to

confer with Dr. Kharitonova.  *Id.* at 168.

Dr. Lamstein testified at her deposition that Dr. Kharitonova told her that Howard

believed that his symptoms resulted from a stomach virus and that the stomach virus in turn led

to a panic attack.  *Id.*[5]  Dr. Kharitonova also told Dr. Lamstein that as long as the NYPD was

---

[5]        There is no evidence in the record that Dr. Kharitonova concurred with Howard regarding the cause of his anxiety and panic attacks.

aware that Howard was taking Klonopin, she did not object to his returning to work in a limited

capacity.  *Id.* at 171.  After conferring with Dr. Kharitonova, Dr. Lamstein took Howard off of

sick leave and placed him on restricted duty effective March 29, 2011.  Defs. 56.1 Stmt. ¶ 85.[6]

On March 30, 2011, Howard saw Dr. Kharitonova again.  *Id.* ¶ 86.  Dr. Kharitonova's

notes indicate that Howard continued to experience anxiety attacks but "much less."  Umansky

Decl. Ex. F at PSYC 52.  Dr. Kharitonova found that Howard had reduced attention and "fair"

insight and judgment; she continued Howard on Lexapro.  *Id.*  Over the next several months,

Howard continued to see Dr. Kharitonova regularly, including at least one visit in April, two in

May, two in June, one in July, two in August, and two in September.  Defs. 56.1 Stmt. ¶¶ 88-90,

98; Plaintiff's Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Pl.

Reply 56.1 Stmt.") ¶ 98.  Dr. Kharitonova took Howard off of Klonopin in April and changed his

prescription from Lexapro to Wellbutrin, another antidepressant that helps with anxiety, in May.

Defs. 56.1 Stmt. ¶¶ 91-94.  Howard reported to Dr. Lamstein that he stopped taking all

psychotropic medication on August 29, 2011, Umansky Decl. Ex. B at 316; Dr. Kharitonova's

notes from September 14, 2011, indicate that Howard was anxious and suffering from reduced

attention and reduced concentration, Umansky Decl. Ex. F at PSYC 43.

On September 20, 2011, after several visits with Howard and consultation with Howard's

physician and therapists, Dr. Lamstein told Howard that she would recommend his discharge

from the NYPD.  Defs. 56.1 Stmt. ¶ 101.  Approximately one week later, Howard reported to Dr.

Kharitonova that he no longer experienced anxiety or panic attacks.  Umansky Decl. Ex. F at

PSYC 55.

---

[6]      "When a police officer is on restricted status, the officer is assigned to administrative work inside a
command and may not be permitted to carry a gun or shield."  Defs. 56.1 Stmt. ¶ 8.

On November 28, 2011, Dr. Lamstein submitted a five-page memorandum to the PES

Director, Dr. Arthur Knour, recommending that Howard be separated from the NYPD.

Umansky Decl. Ex. C.  Dr. Knour seconded Dr. Lamstein's recommendation, assessing that

Howard "has difficulty dealing with stress without developing significant and disabling physical

and psychological problems."  Andersen Decl. Ex. C at D 8.  Recommendations from the

Commanding Officer of the Medical Division, the Chief of Personnel and the First Deputy

Police Commissioner in late 2011 echoed these sentiments, and on January 24, 2012, then-

NYPD Commissioner Raymond W. Kelly approved Howard's separation from the NYPD.  *Id.* at

D 5-7.

Howard filed a complaint with the Equal Employment Opportunity Commission

("EEOC") and received a Right to Sue letter on November 14, 2012.  Howard promptly initiated

this action.  After unsuccessful mediation and fact discovery, Defendants moved for summary

judgment.

## DISCUSSION

### I.      Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'Where the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal

quotation marks omitted).  Courts construe any ambiguous fact "in the light most favorable to the

nonmoving party."  *Giordano v. City of New York*, 274 F.3d 740, 746 (2d Cir. 2001).  Still, "[t]he

non-moving party may not rely on mere conclusory allegations nor speculation, but instead must

offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

"Once a party moving for summary judgment has made the requisite showing that there is no factual dispute, the nonmoving party bears the burden of presenting evidence to show that there is, indeed, a genuine issue for trial." *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (*per curiam*). Rule 56 does not require the nonmoving party to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment," *e.g.,* there is no requirement that the nonmoving party depose his or her own witnesses. *Celotex*, 477 U.S. at 324. Still, "[m]aterials submitted in support of or in opposition to a motion for summary judgment 'must be admissible themselves or contain evidence that will be presented in admissible form at trial.'" *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169-70, (2d Cir. 2014) (*per curiam*) (quoting *Santos*, 243 F.3d at 683).

## II.    Howard Has Not Established that There is a Genuine Question of Fact Whether Defendants Unlawfully Discriminated Against Him

Howard primarily alleges that his termination constituted a violation of the ADA, which prohibits discrimination based on an employee's disability.

> "[T]o establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."

*McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). For the purposes of this motion, the parties do not dispute the first and fourth elements, and the parties acknowledge that Howard met the second element (though they disagree about how). The Defendants assert that they terminated Howard because he was not fit for duty due to a predisposition to anxiety. Howard does not dispute that a

police officer who is predisposed to anxiety is unfit for duty but argues that Defendants

inaccurately diagnosed him as being predisposed to anxiety.  If true, this would permit him to

bring a claim that he was "regarded as" disabled, which satisfies this second prong.[7]  *See* 42

U.S.C. § 12102(1)(C), (3)(A).

### A. Howard Has Not Produced Evidence that Creates a Question of Fact Whether He Could Perform the Essential Functions of the Position of Police Officer

The ability to "perform the essential functions" of the job, with or without reasonable

accommodation, is an element of a *prima facie* case of disability discrimination.  *DeRosa v. Nat'l*

*Envelope Corp.*, 595 F.3d 99, 102 (2d Cir. 2010).  "If the consequences of the handicap are such

that the employee is not qualified for the position, then a firing because of that handicap is not

discriminatory, even though the firing *is* 'solely by reason of' the handicap."  *Teahan v. Metro-*

*North Commuter R.R. Co.*, 951 F.2d 511, 516 (2d Cir. 1991) (emphasis in original); *see Shannon*

*v. New York City Transit Auth.*, 332 F.3d 95, 99-100 (2d Cir. 2003).  This "inquiry essentially

boils down to examining what conduct is symptomatic of the handicap, what conduct the job in

question requires, and how these two interact."  *D'Amico*, 132 F.3d at 151.

The parties do not meaningfully dispute most of the operative facts in this case.

Defendants concede that they terminated Howard's employment because of their diagnosis that

he suffered from a predisposition to disabling anxiety.  Howard asserts that the disabling anxiety

and panic attacks from which he suffered were a temporary problem that had ended by the time

he was terminated.  Aside from his self-serving lay self-diagnosis, however, he has presented no

admissible medical or expert evidence in support of his belief that the Police Department's

---

[7]     Prior to January 1, 2009, an individual asserting a "regarded as" claim under the ADA had to establish that the impairment at issue limited a major life activity; in 2008, however, Congress passed the ADA Amendments Act, Pub. L. No. 110-325, 122 Stat. 3553 (Sept. 25, 2008), which explicitly permitted "regarded as" claims irrespective of "whether or not the impairment limits or is perceived to limit a major life activity," *id.* § 3(3).

diagnosis is wrong. Thus, the only potential dispute regards the validity of the Defendants'

diagnosis.

In support of their determination that Howard is not fit for duty due to his vulnerability to

anxiety, Defendants offered the testimony of Dr. Lamstein, a NYPD staff psychologist with a

Ph.D. in psychology and decades of experience as a clinical psychologist. Andersen Decl. Ex. F.

After seeing him periodically over a period of more than six months, Dr. Lamstein concluded

that Howard was not fit for duty because he is "vulnerable to anxiety and there is a significant

risk for recurrence in the future." Umansky Decl. Ex. C ¶ 1. Dr. Lamstein noted that Howard's

initial anxiety outbreak, regardless of its cause, lasted from February 2011 through September

2011. *Id.* ¶ 15.

Dr. Lamstein came to her diagnosis after examining Howard multiple times during the

seven-month period following his initial sick leave. Dr. Lamstein consulted with Dr. Hernandez,

Dr. Kharitonova, and LCSW Spirn multiple times regarding Howard's symptoms, medications,

and prognosis. Umansky Decl. Ex. B at 135, 147-48, 168, 170, 176, 211-15, 217-20, 237, 250,

305, 313, 322, 329-30, 358. She contacted Howard's college psychologist regarding symptoms

from eight years prior, *id.* at 302-03, and took into account Howard's family history of anxiety,

*id.* at 86-89. Dr. Lamstein considered the possibility that Howard's anxiety had abated by the

time that she made her recommendation but noted that his anxiety, triggered by occurrences like

a breakup or a stomach virus, would likely recur when he was presented with the far greater

stress of being a police officer. *Id.* at 198. She acknowledged in her final recommendation that

Spirn's final report suggested that Howard was ready to resume work and that, on September 28,

2011, Dr. Kharitonova also cleared Howard's return to work. Umansky Decl. Ex. C ¶ 13.

Nevertheless, Dr. Lamstein found that, as calm as Howard was in September 2011 after he had

been on sick leave and modified duty for seven months, the stresses of full duty police work

would likely reignite his anxiety.  *Id.* ¶ 15.  Dr. Lamstein's report persuasively articulates a basis

for her diagnosis that Howard suffers from a predisposition to anxiety.  *Id.*

Howard acknowledges that he suffered from anxiety and panic attacks at times during the

period from March to September 2011.  *See* Pl. Reply 56.1 Stmt. ¶¶ 29, 37, 45, 48, 50, 60, 66,

71, 73, 77, 79, 82-83, 86-88, 90, 99.  He argues, however, that his anxiety was the product of the

medications that he was taking for stomach problems that were unrelated to stress.  *See* Pl. Mem.

Opp. at 8; Umansky Decl. Ex. A at 55-56.[8]  The evidence that Howard cites is not sufficient to

create a genuine issue of fact as to whether he is fit for duty.

Howard relies primarily on two categories of evidence to create a question of fact

regarding his ability to perform the duties of a police officer.  First, he relies heavily on his own

testimony; this constitutes, however, "conclusory allegations or unsubstantiated speculation" that

does not render a dispute "genuine."  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d

Cir, 2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)); *see*

*also Matsushita*, 475 U.S. at 586 (nonmoving parties "must do more than simply show that there

is some metaphysical doubt as to the material facts").  Howard testified that in September 2011

he was fit "to return to full duty" because he "felt healthy a hundred percent."  Umansky Decl.

Ex. A at 61.[9]  This testimony would provide a sufficient basis for the jury to conclude that

---

[8]    There may be a genuine dispute as to the causes of some of Howard's stomach symptoms.  Howard asserts
that he experienced a "stomach virus," diarrhea, nausea, and other stomach symptoms independently from any
anxiety.  *See, e.g.,* Pl. Reply 56.1 Stmt. ¶ 108.  Defendants assert that these symptoms are likely the product of
underlying anxiety but concede that it becomes a "chicken or an egg" issue whether the anxiety caused the stomach
symptoms or vice versa.  Umansky Decl. Ex. B at 256-57.  The Court assumes for the purposes of this motion that
Howard's stomach symptoms were not caused by anxiety.  *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.
1996).  Nevertheless, the NYPD properly considered that stomach symptoms, which might normally lead to a day or
two of missed work, in Howard led to crippling anxiety and panic attacks that landed him on sick leave for weeks
and on psychotropic medication and restricted duty for months.

[9]    It is worth noting that Howard told Dr. Lamstein in May 2011 that he was ready to return to full duty police
work.  Umansky Decl. Ex. B at 178-79.  His self-assessment of his mental health was badly out of sync with his own
treating psychiatrist, who was still prescribing psychotropic medications and who did not clear him to return to full
duty for another four months.

Howard *believed* that he was psychologically healthy in September 2011.  But a police officer's

subjective *belief* that he is fit for duty is not enough to create a genuine question of fact in the

face of a contrary diagnosis by a qualified professional.[10]

A similar flaw infects Howard's other evidence – contemporaneous notes from Dr.

Hernandez, LCSW Spirn, and Dr. Kharitonova.[11]  Dr. Kharitonova's notes from September 28,

2011, stated that Howard was "clear to work" because in the past two weeks he had suffered "no

anxiety or panic attacks."  Umansky Decl. Ex. F at PSYC 41.  Even assuming those notes are

admissible evidence of the therapists' opinions – a doubtful assumption – there is no indication

in the record that any of Howard's treating professionals, including Dr. Kharitonova, ever

proffered an opinion, let alone one they were prepared to repeat in court subject to cross

examination, about whether Howard is vulnerable to anxiety or whether his anxiety would likely

recur if he were placed in a stressful job.

In a final effort to create a question of fact, Howard challenges Dr. Lamstein's

methodology, qualifications, and conclusions.  When a defendant's physician does not have an

"objective, scientific basis for" her conclusions and does not base her decisions on the best

---

[10]     There is no question that the Plaintiff worked hard to overcome his anxiety so that he could return to his dream job.  While there are jobs in which an employer might reasonably be expected to give the employee the "benefit of the doubt" and return him to duty to see whether the Plaintiff's opinion is correct (that is, that his anxiety condition is cured and never recurs) or the employer's psychologist's opinion is correct (the employee relapses with anxiety and panic attacks when returned to the stress of full duty), given the potential danger to the public and to the Plaintiff, being a New York City Police Officer is not such a job.  Indeed, it is a defense to an ADA claim that an employee would pose a threat to the health or safety of others.  *See Nelson v. City of New York*, No. 11-CV-2732(JPO), 2013 WL 4437224, at *12 (S.D.N.Y. Aug. 19, 2013) ("It is true that, as with a firefighter, 'the demands placed upon a police officer are unique and extreme, and the job is dangerous and difficult, even without outside variables.  Any lapse in judgment or alertness could easily result in injury or death.'") (quoting *D'Amico*, 132 F.3d at 151) (alterations omitted).

[11]     The Plaintiff did not submit any formal reports or declarations from his treating therapists or physician.  While the Court does not question the authenticity of the physicians' and therapists' notes, if they are being offered for the substantive diagnoses contained within them, they are inadmissible hearsay.  *See United States v. Baker*, 166 F. App'x 566, 568 (2d Cir. 2006) (summary order) ("[T]estimony related to Baker's substance-abuse diagnoses was hearsay if offered to prove that Baker had such a condition."); *Delaney*, 766 F.3d at 169-70 ("Materials submitted in . . . opposition to a motion for summary judgment must be admissible themselves or must contain evidence that will be presented in admissible form at trial.") (internal quotation marks omitted).

available scientific evidence, then her opinion does not provide a basis for summary judgment. *Cf. Bragdon v. Abbott*, 524 U.S. 624, 654-55 (1998).  In *Bragdon*, the Supreme Court held that a dentist's unsupported and erroneous view that drilling into a tooth risked creating an airborne AIDS virus, "based on the absence of contrary evidence, not on positive data," lacked "a traceable, analytical basis in objective fact" and therefore could not be considered on summary judgment. *Id.* at 653.  Of course, psychology and human behavior are not subject to the same level of certainty as scientific conclusions based on basic biology.  While there are provable vectors for HIV infection, predicting whether a person who has previously suffered crippling anxiety will again is not subject to the same levels of scientific precision.

Nevertheless, applying the principle articulated in *Bragdon*, this Court has held that when an NYPD psychologist's fitness for duty determination does not rely on the best available evidence and does not take account of credible, professional analyses of the plaintiff's condition, the fitness for duty determination does not provide a basis for summary judgment. *See Nelson v. City of New York*, No. 11-CV-2732(JPO), 2013 WL 4437224, at *12 (S.D.N.Y. Aug. 19, 2013).

Although Plaintiff relies heavily on *Nelson*, this case is being decided on a markedly different record than *Nelson* was.  First, the plaintiff in *Nelson* produced substantial admissible medical evidence (including, *inter alia*, an affidavit from her treating psychologist) to counter defendants' medical evidence.  No. 11-CV-2732 Dkt. 33 (Mordukhaev Decl. and attachments). An Article II Medical Board in *Nelson* issued conflicting opinions regarding the plaintiff's diagnosis, relying in part on the treating psychologist's letter.  2013 WL 4437224, at *3-4. Moreover, unlike in *Nelson*, Dr. Lamstein's diagnosis and opinion regarding Howard's fitness for duty took into account all opinions, including Howard's, his treating therapists' and physician's, and those of Howard's bosses at the 70th Precinct.  Umansky Decl. Ex. B ¶¶ 12-14. Dr. Lamstein recognized and even deferred to those opinions, but her deference ended with their

13

analysis of Howard's then-current status, which is all that they purported to assess.  To determine

whether Howard could fulfill the essential functions of the job of police officer, Dr. Lamstein

had to make a diagnosis and a prognosis; a determination that Howard was not currently

experiencing anxiety, while relevant, could did not end her inquiry.  Her final conclusion, that

Howard was susceptible to recurrence of disabling anxiety, is the only reasonable conclusion

compatible with all of the evidence on the record in this case and is unrefuted by competent

evidence from the Plaintiff.[12]  *Cf. Aegis Ins. Servs. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 180

(2d Cir. 2013) (affirming summary judgment where only one party's conclusion drawn from

agreed-upon facts was reasonable).

### B. Defendants Are Entitled to Summary Judgment as to Howard's NYCHRL Discrimination Claims

"[D]istrict courts may decline to exercise supplemental jurisdiction over a claim . . . [if]

the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C.

§ 1367(c)(3).  The "decision whether to exercise [] jurisdiction after dismissing every claim over

which [a court] had original jurisdiction is purely discretionary."  *Carlsbad Tech., Inc. v. HIF*

*Bio, Inc.*, 556 U.S. 635, 639 (2009).  Because this case is two years old and the parties have

undergone extensive discovery, the Court elects to exercise jurisdiction over Howard's causes of

action under the NYCHRL.

The NYCHRL, unlike its state analog, "affords protections broader than the [ADA]."

*Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 884 (2013).  "[U]nlike the [ADA], the

City HRL places the burden on the employer to show the unavailability of any safe and

reasonable accommodation and to show that any proposed accommodation would place an undue

---

[12]     Howard's argument that Dr. Lamstein did not account for the fact that Adjustment Disorder – one of Dr. Kharitonova's two diagnoses – is a temporary condition that lasts several months, is unpersuasive because it ignores the fact that she also diagnosed a Panic Disorder.  Pl. Mem. Opp. at 13; *but see* Defs. 56.1 Stmt. ¶ 66.  Howard has adduced no evidence that Panic Disorder is a condition of limited duration.

hardship on its business." *Jacobsen v. New York City Health and Hosps. Corp.*, 22 N.Y.3d 824, 834 (2014). In this case, as discussed above, Defendants have carried their burden and established that Plaintiff cannot fulfill the essential functions of the job of police officer, and Plaintiff has not produced any evidence that could support a jury's inference that he could have fulfilled these functions. Moreover, Howard – believing that he is not disabled – never requested reasonable accommodation. *Cf. id.* at 835.

Finally, because Howard does not have a cause of action for discrimination, he cannot show aider and abettor liability or employer liability as set forth in his fourth and fifth causes of action, respectively. Compl. ¶¶ 71-76.

Accordingly, Defendants are entitled to summary judgment on all of Howard's causes of action for unlawful discrimination.

## III.   Howard Has Not Established a *Prima Facie* Case of Retaliation

Howard's Complaint alleges that Defendants violated 42 U.S.C. § 12203 and the N.Y.C. Admin. Code § 8-107(7), both of which prohibit retaliation. Compl. ¶¶ 64-67, 77-79. The Complaint does not contain any specific allegations that might put Defendants on notice of what protected activity Howard engaged in or what adverse action the Defendants allegedly took in response. Neither party's motion papers discussed this cause of action, although Defendants' motion indicates that they seek an order "dismissing all claims in this action." Dkt. 30 at 1.

"Generally, but perhaps not always, a partial response [to a motion for summary judgment] reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them." *Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014). "Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may

15

conclude that abandonment was intended." *Id.* The Court interprets Howard's failure to adduce

*any* evidence of either protected activity or an adverse action as an indication that Howard has

abandoned his retaliation claim.

Even if Howard had not abandoned his retaliation claim, summary judgment would be

appropriate because there is no evidence establishing a *prima facie* case of ADA retaliation.  "To

establish a prima facie case of retaliation in this context, [Howard] must demonstrate that (a) he

'engaged in protected activity,' (b) [a Defendant] was 'aware of this activity,' (c) [Defendants]

'took adverse action against him,' and (d) 'a causal connection exists between the protected

activity and the adverse action.'"  *Sista*, 445 F.3d at 177 (quoting *Reg'l Econ. Cmty. Action*

*Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002)) (alteration omitted).  There

is no evidence tending to establish either that Howard engaged in protected activity prior to his

termination, *see* Umansky Decl. Ex. A at 62-63, or, if he did, that Defendants were aware of the

activity, *id.* The record only reflects one adverse action against Howard – his termination –

which was taken, as all parties concede, "solely because Defendants perceived Plaintiff to be

disabled."  Pl. Mem. Opp. at 7.  The Court therefore grants Defendants' motion for summary

judgment as to Howard's retaliation cause of action.[13]

**IV.     Howard's Claims against the NYPD Must Be Dismissed**

Even were this case to survive summary judgment, Howard's Complaint names the

NYPD as a defendant; the NYPD, however, "is a non-suable agency of the City."  *Jenkins v. City*

*of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *see* N.Y.C. Charter § 396 ("All actions and

proceedings for the recovery of penalties for the violation of any law shall be brought in the

---

[13]     Howard asserts that Dr. Lamstein sought to have him dismissed so as to avoid paying his pension.  Pl. Mem. Opp. at 15, Umansky Decl. Ex. A at 58-59.  This argument does not constitute an allegation of retaliation as it does not include an allegation that Howard engaged in protected activity or that Defendants responded to such activity.

name of the city of New York and not in that of any agency, except where otherwise provided by

law.").  Howard's claims against the NYPD are therefore dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is GRANTED.

The Clerk of the Court is respectfully directed to enter judgment for the Defendants, to terminate

Dkt. 30, and to terminate the case.

**SO ORDERED.**

**Date:  October 20, 2014**            **VALERIE CAPRONI**
        **New York, NY**                **United States District Judge**